But I guess I'll just point out we are in the afternoon. We'll appreciate everybody adhering to the time limits that are set. The yellow light tells you you have two minutes. The red light comes on. We ask you to conclude your argument. We have read the briefs and the record excerpts. We may not have read the whole record before hearing oral arguments, so we will appreciate your citing the record when that's appropriate. This first case is No. 18-30815, United States v. Duruisseau. Well, where's my – Mr. Talbot. Good afternoon, Your Honors, and may it please the Court. A knowing and willful agreement to violate the law is an essential component of a conspiracy conviction. You're representing Mrs. Duruisseau, right? That's correct, Your Honors, LaShawn Duruisseau. And there must be proof in this case that LaShawn Duruisseau knew that her businessman husband and his attorney were violating the law by failing to disclose certain material facts to mortgage lenders and that she intended to further their unlawful purpose. Not one witness testified at the trial that LaShawn Duruisseau had any involvement or knowledge whatsoever with any of the disclosures to the lenders in this case. The government's theory of guilt below and in their brief is that because LaShawn Duruisseau had basic knowledge of her husband's business and because she performed certain clerical acts on behalf of her husband's business and because as a spouse she was part owner of the business, she necessarily must have known that her husband was failing to disclose certain material facts to the mortgage lenders. Well, she also helped solicit people to participate in the purchase and rental scheme, didn't she? That's correct, Your Honor. She did – she was present at the home when the Longs of the Akinkabes came to visit with Mr. Duruisseau about whether they wanted to invest in his real estate properties. And the government cites the Mr. Akinola Akinkabes testimony where he says that LaShawn Duruisseau was present and that one of the reasons they invested with Mr. Duruisseau was that church relationship they had with the Duruisseaus. But if the court looks at the citation that the government cites to Mr. Akinola Akinkabes' testimony, what he's saying is simply that she was present while discussions were had about entering the real estate business. There's no testimony by Mr. Akinkabes that LaShawn Duruisseau was there when they talked about any of the substantive details of these transactions. She was not there when Mr. Akinkabes or the Longs filled out loan applications. She wasn't a part of the creation of the – I mean, in many criminal cases you have to show things through circumstantial evidence. And so here there's a great deal of evidence of her having the information, providing information to people, having all of the documents. And so why isn't that enough at least to present to the jury? I mean, they could have found for her, I agree, or found not guilty. But why isn't that enough to support a circumstantial evidence case against her? Your Honor, you are correct that both circumstantial evidence can be used to prove this case as well as rational inferences from that evidence. But all of the circumstantial evidence and the rational inferences only say that LaShawn Duruisseau knew about her husband's business generally. There's no circumstantial evidence or inferences that can be drawn that she knew of the illegality, that she knew that there was a failure to disclose information between her husband, her husband's attorney, and the lenders because no witness testified that she was involved in that process. And four witnesses testified at this trial. But she knew that he wasn't getting these fees for renovations because he wasn't doing the renovations. Your Honor, I don't think that's correct. There's no evidence that she knew the disbursement of the money in the closing statements. And here's why. The government focused extensively at trial on the source of the down payments, and they came from a trust fund account set up by Harold Lee, the attorney, in the name of Andre Long. In that trust fund account, there's no evidence that LaShawn Duruisseau had access to the account or even knew it existed. On the HUD-1 settlement statements, the disbursements are listed to Maintenance and Repairs to Dion Duruisseau, not to LaShawn Duruisseau. And the payment stubs that are issued as the disbursement checks are all made out to Dion Duruisseau. So there was no evidence introduced by the government that a reasonable inference could be made that she knew where and how. You're saying she didn't know that her husband had promised these people that they were going to get into the real estate business without putting any money down, that they were going to be able to borrow money from considerable sums from the bank without putting down a dollar because Dion would take care of the financing. Then Dion would upgrade the properties and make them valuable income-producing rent houses. She didn't know, and she didn't know that you have to tell a bank that you're paying your own money in order to borrow more? Your Honor, there's no evidence in the record that she knew both of those things, right? There's no evidence that she knew either that it was unlawful for her husband to loan down payments. I thought they had already – I thought they went big with this idea of theirs after they had done a couple of rent properties on their own. Your Honor, that's correct. They did own their own rental properties. But in addition to that, when they were soliciting, to use Your Honor's words, the Longsley and Kinkabays to invest with them, there's no evidence that those discussions that LeChandra Duruisseau were privy to involved the source of the down payment funds. And again, they came from an account she didn't have access to. Okay. I'm interested that you're here arguing on behalf of LaShawn, and Mr. Averly, I guess, is not here – not going to argue about – for Dionne? No, it's – it doesn't matter. I was just sort of inquiring because she barely gets any time in prison. She gets 52 weekends, so. That's correct, Your Honor. And we did not raise a sentencing issue in our brief because of that. Right. Well, we're aware of all the issues that were briefed. That was another reason I was surprised. Okay. Thank you. Thank you, Your Honor. All right. Mr. French. Good afternoon, Your Honors. May it please the Court. My name is Ron French. I'm here today with Mike Walsh on behalf of Appellant Carol Lee, who we represent in this matter and whose conviction we seek to reverse today. Your Honors, if you've read the briefs, you're well aware this is not a typical case. This is not a typical mortgage fraud case. This is not a typical appeal. This is – we're not here making an obligatory sufficiency of evidence argument for Mr. Lee. We're here because this case was riddled with errors, which the trial court recognized almost from the beginning of the case, and those errors are continuing to taint the jury verdict. We began with four counts in the indictment. Of course, count four was thrown out halfway through trial because the government failed to prove its case, and the district court recognized this. Eighteen months after trial, the district court threw out count three, which the jury also found was proven because the court found that there was no evidence whatsoever to support one of the elements of count three. Was that – I assume that that error had been pointed out to the court during the trial. Yes, Your Honor. We moved for a judgment of acquittal during the trial for that, made this exact case, and presented all of the evidence that we later presented again, and the court denied it and found that there was sufficient evidence. But, of course, when the record came out, that proved that there was no testimony on the relevant point. So we began with four counts, and we're down to two. Well, the problem is not over, Your Honors. Let's take the count one conspiracy. The two primary basis of the count one conspiracy were counts two and three, and count three has already been reversed. So you've already got a problem with count one. Then you also have several reasons that count one falls on its own accord. And this has been voluminously briefed, but suffice it to say if you look at the indictment in this case, and that's record document 29 through 38, you'll see that this indictment is completely devoid of any specifics. And numerous times we said, Judge, this indictment, read literally, will prevent – will allow the government to present any theory of fraud it wants to at trial. So long as it has to do with a real estate transaction, it will fall within this indictment. I thought the government filed two bills of particulars. They did, Your Honor, but it was actually the first bill of particulars that led us to file our motion to dismiss or limit the indictment because the first bill of particulars confirmed that far from treating that language as surplusage in count one, they were exploiting that language. In fact, if you look at the list of – and that's in the record of 136, 75 and 136, where we discussed the first bill of particulars, it expanded the number of transactions that were mentioned in the indictment. It expanded the lenders that were mentioned in the indictment. It expanded the potential documents that had something to do with this in the indictment. It expanded it at every level. And so we immediately responded. We filed at one another motion for a bill of particulars to try and clarify that, and we simultaneously or the day prior we also filed a motion to dismiss or limit the indictment, and those are the documents there at 75, 136, 187 and 170. We briefed this four different times in the trial court, and we said this could be a runaway trial. This could be a trial by ambush. If we're looking at the indictment, we know only a couple of things. We know that the government thinks that assignment of contracts aren't legal, which we know they are, so that doesn't make any sense to us. We know that the government thinks these funds were borrowed, but they weren't borrowed. They were all gift funds. So we're not sure what the government is going to allege at this trial. That was the basis of the bill of particulars. It was also the basis of the motion to dismiss, and as we pointed out in the motion to dismiss, it's black-letter law in this circuit that you can't use a bill of particulars to cure a deficient indictment. So to the extent that there is a problem with the indictment, you can't just look at the bill of particulars to say, well, that cures it. Maybe that does minimize some prejudice in some cases. But isn't it always true that the indictment is not a narrative of everything that's going to happen at trial? Absolutely, Your Honor, and that's the government's primary opposition to this is that what we're asking for is evidence. I can assure you that we were not asking for evidence. What we would have liked to – That's consistent with the notion that an indictment is a relatively short document. Absolutely, Your Honor. If I could just point to the government's closing in this case, in which you had there are no less than 10 distinct theories of fraud that they argued to the jury. And we're not asking for the evidence that supported those theories, but we should have known is these are different theories of fraud. I'm talking about maybe the most – the primary one, that gift funds are not allowed on investment properties. And that's in the record at 1963. Or that assignments are improper, even if they're legal in the state of Louisiana, which they are, that they are illegal if the lender doesn't like them and you didn't disclose it. And that's at 1948 and 1949. Or the fact that the lenders – that the defendants put together a dummy bank account, the sole purpose of which was to fool banks, and then that they drafted fake money orders, which, by the way, the record doesn't support at all. Yet the government continues to rely on that theory in this case. That's at record 1955. The failure to disclose any interest in the property, which is not mentioned in the indictment. Let me ask you a question, though. Doesn't the government rely on the Griffin case in response? In other words, if the jury has one theory that is supported by legally sufficient evidence and others that are not, and they proceed to convict, that we uphold the conviction? Yes, Your Honor. That's their primary objection to this argument. And I'm not saying that's necessarily admirable law, but that is the law. Well, and if you look at the Griffin case, what the Griffin case stands for is that if you have two factual theories that are submitted to the jury, one of which is horribly weak and one of which is strong, then the jury returns a guilty verdict. Well, arguably it could be up in the air whether they relied on the horribly weak one for which there was no evidence or the strong one. And the Griffin course goes to great lengths to say that in the common law there's a presumption that juries are capable of finding the correct facts based on the evidence. And in the absence of any evidence to the contrary, we're going to presume that the jury got it right. That is nothing like this case. The jury got it wrong in this case. We know that. The jury, Judge Durell and the trial court already found that one of the two counts underpinning count one, the conspiracy, was completely wrong. And that transforms it from an error. And you had a technical finding because that was the failure of proving the federally insured, which I agree the jury should have looked for. But it's not the same thing as saying they totally missed the whole case. I think legally it is the same, Your Honor. I think all of the elements are created equal. And the jury in this case found something that it could not have found based on the evidence. And that's one reason that already throws the jury into question. But when we know that if they couldn't have found it with respect to count three and they were permitted to and they were in fact invited to invite that same error into count one, we have to presume that the jury followed its instructions and it did that. There's a great Sixth Circuit case that says exactly this thing, distinguishing Griffin on the same grounds, the Henning case that's cited in our brief. And it says this is a presumption. And when we know the jury got it wrong and we reverse a conspiracy conviction, the trial court, it was plain error for the trial court not to consider the effect of the conspiracy incorporating that reverse finding. I know you're not going to like this question because you don't want to get to sentencing because you want the conviction to be reversed. But if we get to sentencing, is it your argument that the or is it the defendant's arguments that there was no intended loss? In other words, that everybody thought this was going to work, this process of helping these people get these rental properties, that they would make money and that there never would be a loss, that the loan would be paid? Your Honor, that's. Is that part of the theory of the attack on the sentencing of the defendants generally? Otherwise, maybe not your specific argument. No, I don't think so, Your Honor. It's my belief that that was, in fact, their beliefs. However, for purposes of the legal argument, all that matters is we said, hold on a second, the trial evidence to the extent it showed things was that Wells Fargo was an FDIC insured lender. So, therefore, you can commit bank fraud against Wells Fargo. We know you can't do that with Wachovia. We know that it has certain underwriting guidelines that prohibit the things like the assignment and having an interest that's not disclosed and having gift funds used in investment property transactions. Although, by the way, you can have gifted funds in any other transaction. Just one of the nuances of the underwriting guidelines. And as we pointed out, these are things that are very specific to Wells Fargo. It has to do with the sentencing. Because how that goes into sentencing is the government didn't just rely on Wells Fargo transactions at sentencing. So, that's your client. But your co-defendant's argument is broader than that. So, y'all aren't making that broader argument. Correct. I'm not. The down payments is the number. You're just saying they should only use the Wells Fargo down payments. Correct, Your Honor. And I think he's joined with me, Dion DeRusso has joined with me in the alternative on this argument. And I think it's actually the better loss calculation for him. It's also the more supported by the law. If you look at this court's decision in Benz and Bernegar, this court very explicitly says, in a loss calculation in a bank fraud case or in a wire fraud case, in the case of Benz, if the defendant challenges that the conduct included in the loss calculation is illegal or doesn't meet the requirements of the statute, the government has to provide some evidence of that. And in this case, I asserted that in our objections. And we argued at length about this at the trial court. And they did the same thing they'd done in their brief on appeal, which is the record is full of evidence of wire fraud or these issues. But I don't think that's good enough. It's not good enough under this court's precedent. And, by the way, it's contrary to some of the evidence at trial. For instance, you have Harrison Finance Company, who's included in the loss calculation, who the government's own witness testified those transactions were legitimate. That's Stephen Huffman's testimony. Your Honors, while I have some limited time, I want to make sure I address the specific unanimity instruction that we requested. This was a critical part of this case. As we talked about, there is this what can only be described as a flurry of different theories or allegations about what may have been done wrong. And if there's any doubt about that, I urge you to just please look at the government's closing. What we said prior to trial and preserve this error is there is so much risk of confusion here that the jury has to be told that it must agree on the specific misrepresentation in counts two and three. And we cited some case law for that. And the court said no. However, that's completely contrary to this court's precedent. If you look at the Morrow decision, this court found that that was a correct statement of law, that in a bank fraud case that the jury should have to agree on the particular misrepresentation underlying the bank fraud. The government has said, well, this is more similar to wire fraud or mail fraud. And look at, in citing the Nanda case, well, that's not true. This is a bank fraud case, so it's more similar to the bank fraud case of Morrow. And that court did not hold that it was reversible error to not give the instruction, but it held the instruction proper. However, under this court's analysis in the Villegas case and the Supreme Court's decision in Richardson, the analysis is twofold. It's, one, is unanimity required because it's an element of the offense? In bank fraud, that's almost indisputably true under the right analysis. And that's going straight to the statute, 1344, Section 2, requires a misrepresentation not comparable to mail or wire fraud. So if they have to agree on that, then the only question we ask after that is was the general unanimity instruction sufficient in this case to ensure unanimity? It was absolutely not, Your Honor. As we talked about, there was no less than ten separate theories of fraud just talked about at closing. And then if you look at the court's unanimity instruction in this case, the only thing it says, I quote, is your verdict must be unanimous. It doesn't say unanimous as to each count, which is what the pattern instructions say. It doesn't say unanimous as to count two or three. The only specific application of the unanimity ruling is with respect to the conspiracy verdict, which we're not contesting the unanimity there. Your Honors, I see my time has expired. If you have any further questions, please let me know. Okay. Well, we may have on rebuttal. Thank you. Thank you, Your Honor. Ms. Griffin? Thank you, Your Honor. I will say this does not seem to be a very carefully set up prosecution. Your Honor, it is far from a perfect prosecution. I will absolutely concede that. But it was not as bad as the defendants make it out to be. And I just wanted to point out a quick example just based on the argument opposing counsel just made. He talked about the government having ten different theories of fraud in this case. And he cited to this particular example in the government's closing saying that this was the government saying that assignment, contract assignments are bad and are illegal in and of themselves. The only thing the government says, it's on page 1948 and 49 of the DeRusso record, I'm sorry, the Dion DeRusso record, 30815, is that the government talks about the fact that the initial contract with the seller of the house was for $45,000. When they closed, it was for $67,000. And the only thing that changed in between is that the defendants raised the price so that they could borrow more money and split the money between them. So the government did not argue that contract assignments are bad in and of themselves as the defendant just claimed. And that's just one example of their gross overstatement of what happened in this case. Let me ask you this. So today we got the orders from the Supreme Court that GVR doesn't, I don't know how many, but at least some cases based on this rehave that are not gun possession cases. So the rehave case that the counsel just filed a 28J and requested a supplemental briefing on. So although it was just brought up, this was a case that's a few months old, the fact that the Supreme Court is GVRing a lot of cases on this, does that suggest that this case is something we should take into account in this case? No, ma'am. And let me freely concede, I didn't get notified about this until about 8.30 last night, and I was in a hotel and didn't have really any time to do any of my own research. But just right off the bat, I would say that the Supreme Court was interpreting a very specific statute and very specific language in that statute. And they were attempting to determine which elements, which words in the statute were modified by the word knowingly. As I appreciate the defendant's argument in their 28J letter and their motion, the primary thing that they are talking about that should be modified by knowingly is materiality. But if you read the bank fraud statute, there is no materiality. That word is not in the bank fraud statute. So there's no way that you can interpret 1344. Excuse me. It's always been interpreted to require a material misstatement. I absolutely agree, Your Honor. It does require materiality. The Supreme Court made that very clear in Nader. My point is that in analyzing the language of the statute as the court did in Rahif, or Rahaf, I apologize, I don't know how to pronounce it. But when analyzing the language of the statute as the court did in that case, then you don't get to the knowing materiality in the bank fraud statute. I absolutely agree that materiality is an element of bank fraud, and I relied on that quite heavily in my brief, that that's the reason some of the evidence was put in, was to establish the materiality. But that's the best argument I could come up with, having no opportunity or ability to do any research. What sort of bothers me is the idea that you have a conspiracy count and you introduce how many transactions, 30 transactions, right? But when it gets down, many, many. I believe there are closer to 40, Your Honor. Okay. And then when it gets down to charging the specific counts of conviction, count four doesn't even have enough evidence to sustain it. Count three, you didn't, you, the government, didn't even prove up that this was a federally chartered financial institution, so the jury has before it count one and count two to sustain the bank fraud, right? Yes. So in terms of the Griffin case, isn't there a very high likelihood that the jury was taking count two, count three, and importing it into their analysis on count one? I don't think so, Your Honor, because I think the evidence did establish that there was a conspiracy involving, as you said, 30-plus pieces of property. The government painstakingly went over that. There were even tables or charts that showed each piece of property and the falsity about it. And what's different about, a little odd about count three, as Judge Haynes just said, this is really more of a technical argument. Had this been charged as a wire fraud, there's no question that the jury's verdict would have been sustained as to count three, but the prosecutor, for whatever reason, chose to charge it as a bank fraud. The defendants did not contest that with any evidence. I mean, the jury was perfectly, it was perfectly appropriate, given the evidence that the jury saw, for them to make the finding that it was a violation of the bank fraud statute. The government had a certificate from the FDIC saying- Well, I don't really care about that because the fact is it's legally insufficient. And the Yates case says if you give the jury a theory, if you give the jury a question, and one theory of the case is legally as opposed to factually, and the other is legally insufficient, then you have to vacate the judgment. Yes, ma'am. But this was a factual error, not a legal one. The bank was not federally insured, and that was a mistake. But the verdict absolutely could stand based on the testimony related to count two, and all of the other conspiracy counts not only incorporated the substantive counts, it also incorporated all of the other properties involved in the scheme. Count three was just one of many, many properties that the jury heard evidence on. I'm just kind of wondering. I mean, it kind of gets back to my question about the sentencing, which counsel opposite didn't think was very helpful. But, you know, when we think about Mrs. Deriso, how is this obvious to her that this is a scheme? I mean, they're helping people who maybe wouldn't have the money to buy these rental properties. Maybe that's not the best in hindsight because when you have a problem and, you know, everything tanks and the real estate market goes down instead of up and you have all these issues. But, I mean, we had all of that happen. That was the cause of the 2008 financial crisis was banks were lending based on thinking everything was going to be great, and then it wasn't. So just thinking that the world is going to be a good place doesn't strike me as fraudulent. It may be naive, but it's not fraudulent. So how is it fraudulent for her to think it's okay to try to help these people make money off of rental properties when she and her husband had already done that? And had that happened, had they made the money they thought they were going to make, the banks would have been paid and we probably wouldn't be sitting here. Well, Your Honor, she was responsible. The evidence showed that she was responsible for the accounting for the billionaire properties and their family business, and it showed that the HUD-1s would show, for example, $50,000 going to the DeRussos or HUD-1, I'm sorry, to the DeRussos or billionaire properties for either repairs and maintenance or as seller's proceeds. In reality, they would walk out with a check for, say, $20,000. I mean, she knew that money was being passed or moved around and that they were not expending it. How do you know there was something wrong with the way they moved the money? I mean, this just doesn't strike me as your typical, well, duh, of course that's obvious to anybody that that's a lie. This doesn't strike me quite that same way because of the nature of sort of gifting this money and trying to help people at your church do rental properties, and we have all this house-flipping phenomenon that everybody's excited about that kind of fits in here, and there's no indication that she's some incredible legal scholar that might question it. I'm not saying I would do this. I'm not saying it's a good thing to do, but that's separate from whether it's a crime. I mean, it strikes me as she's just being sucked in because she's the wife of the guy who did it, and that's not appropriate. Well, Your Honor, there was no money to gift. They did not have any money to gift. The gift, as the defendants like to call it, was just by inflating the sales prices of these homes to cover up or to cover for the purchaser their down payment. Are they inflating the price of the home? Is this like the 80s when they just keep flipping in an inflated fake inflation, or is this that they're getting good deals from who they're originally buying for so that when they sell it on the back end, that money really is valid? Like if you're just in a hurry to sell your home, I'm able to get a good deal from you, and then I sell it for a lot more the next month, that's not fraud. That's just a good deal. Yes, ma'am. But what is the fraud in this is the monies that were being pulled out to go to the DeRussos for repairs and maintenance, which they had not performed, because it was on the seller's side, which meant this all should have been done. And for that matter, if they had done the repairs and maintenance, maybe the rental properties would have succeeded. Yes, ma'am, and there was quite a bit of evidence that because the properties were in such poor condition that they could not remain in the Section 8 program, for example, and tenants were lost because of that. What does Mrs. DeRusso know about all of that? Well, again, the direct evidence is hard to come up with because, I mean, literally they're sleeping in the same bed and could be talking about it at night, and we would never know that. There is no way to know. That would mean every spouse of a felon is. . . Correct, correct. So you have to look at the circumstantial evidence, and that's why I presume that the AUSA who tried this case called the CPA to talk about the fact that Mrs. DeRusso compiled all the information that they had about expenses and income, and she sat in on some of the closings, and therefore she would have known that the number she was given to the CPA about expenditures that billionaire properties had done did not match up with the monies that were purportedly paid to billionaire properties or to them directly on the HUD ones. So it is a circumstantial case, clearly. And it would be clear because I haven't done very many real estate transactions myself, but I know, like, when I buy or sell a house, that money that's supposed to be coming to you, some of it ends up being paid to, oh, for the title insurance, for the this, for the that. So the $10,000 that came to me actually is a $7,000 check. That's not a fraud. That's $1,000 going to the title insurance, $1,000 to the whatever, whatever, these expenses that they charge you. So the check you actually get isn't the number that seemed to be the profit you were supposed to get. Yes, ma'am, but that's all articulated on the HUD one. Right, right. But what I'm saying is so the fact that you walk out with a check that looks different than what you might have thought doesn't necessarily mean that you know there's a fraud. I'm just again talking about Mrs. DeRusso knowing, knowing that there's a fraud, not just that maybe a smart person might ought to have asked a question or maybe this isn't the best way of doing business, but knowing, criminally knowing that this is a fraud. Well, maybe you're just relying on your husband to do right and his lawyer thinking, oh, my gosh, now there's a lawyer involved. Well, Your Honor, what I can say is that contrary to what Mrs. DeRusso's counsel said in his argument, Mr. Akinkabay did testify that Mrs. DeRusso was involved in actually explaining to them how the program would work and that the DeRussos would be paying the closing costs and the down payments for the Longs and the Akinkabays. They also, according to Dr. Long's testimony, frequently filled out all this paperwork literally in the DeRusso's living room, which was set up like an office. Again, she took all of the receipts and everything to the CPA. She was the contact person for the renters. She was the contact person for the realtors. She was just thoroughly immersed in what was going on. But, yes, her husband was the one signing the paperwork and doing the things primarily at the closings, yes. But is she entitled to rely on the fact that a lawyer is involved to make her think, well, you know, they got that covered, I don't know what you mean. Well, she didn't assert advice of counsel of defense, and he was also the lawyer. What I'm saying in your mind, I'm not saying the counsel advised her this is fraudulent or it's not fraudulent. I'm saying that when you're trying to get into somebody's intent and there's a lawyer involved, there's the husband involved, and she's just, you know, shuffling papers, is that enough to show knowingly? I don't think so under the facts of this case because, again, she had so much knowledge about the finances and the fact that they were not making the amount of money or expending the amount of money. So that's what should have put her on notice, that we're not really doing these repairs. And so that's a criminal action to get repair money that you don't repair, and that's what she should have known. Just help me figure out what is it that she knew. Specifically, what does she know that's a crime? Well, again, she met with the investors. She explained to them, or she and her husband together explained to them, that they, the DeRussos, would be paying their percentage of the down payment and the closing cost. But that by itself is not a crime, right? Well, yes, when it's misrepresented on the HUD-1. Misrepresented on the HUD-1 is what you're saying? Yes, ma'am, it was misrepresented on the HUD-1. I have a question about the restitution amount. It seems very counterintuitive to estimate restitution based on the down payments, which was money that the banks received. They may not have, the borrowers may not have completed paying off the loans, but they got the money in the down payments. So how can you say that measures restitution? Am I misreading something there? It's not necessarily how I would have done it. Well, it has to have a factual and logical basis, and I don't care how you would have done it. The government did it this way, and it makes little sense to me. Well, the PSR, the probation officer explained in the PSR why this is the way they went. They talked about the fact that they considered the total of the loans, less the payments that had been made, which intuitively seems like the way you would go. But for whatever reason, they rejected that. And they also rejected the funds due to billionaire properties and the DeRussos for repairs and maintenance. And I would point out, Your Honor, that Mr. Lee and LaShawn DeRusso, by adopting Mr. Lee's arguments, did not object to the use of the down payments. Only Mr. DeRusso objected to the use of the down payments. He suggested that instead you should use the money for repairs and maintenance. But then he wanted a credit for his expenses and for the money that he used to pay off Dr. Long's tax lien. So what's the bottom line? It's good enough for government work? Your Honor, you have to preserve and make your arguments below. I think he made an argument. We don't have to accept the offset, but I think he made the argument that just the cumulative amount of the down payments makes no sense at all. And for Mr. DeRusso and Mrs. DeRusso, because she adopted it, that would not have affected their guideline range. It would affect the amount of restitution owed. I agree with that. But it would not have affected their guideline range. Well, restitution is not nothing, and she's only going to be in, you know, she has barely any sentence at all. So she'll be out earning money pretty soon. So this is a big problem for them. Yes, Your Honor. And I don't apologize. I don't have it in my notes, but I think it's around $100,000 difference. No, I thought it was. Well, no. I mean, we'd have to vacate and remand for resentencing, it seems to me. We're not up here to make fact findings. Well, as to restitution, perhaps, Your Honor. Right. But the defendants did not raise the issue of restitution in their appeal. I thought they did. They discussed loss, not restitution. I thought they meant loss for restitution. Okay, well, I apologize if it was restitution that they were discussing. I thought we were just talking about the guideline range for sentencing purposes. So you're saying that even if it is not sustainable as found, it would not have affected the guideline range for either of them? Correct. But Mr. Lee's argument that you should not count Wachovia would affect his guideline range. I believe it did, Your Honor, yes. And so what about that argument, that that's not bank fraud and, therefore, can't be counted? I mean, relevant conduct is relevant illegal conduct, not relevant legal conduct. The indictment charged both a bank fraud and a wire fraud, and even though Wachovia Mortgage Corporation is not federally insured, that does not mean that Wachovia Mortgage Corporation wasn't the victim of the fraud because it is a bank and wire fraud, and there was plenty of testimony in the record about the fact that the money was wire transferred into accounts controlled by the various closing attorneys who then dispersed the money. So I do believe that they would still count as a victim and the restitution number would not change. I'm sorry, the loss number would not change for Mr. Lee. Your Honors, my time is about to end. If you have no further questions, I would see to it. Thank you. Thank you. Your Honors, thank you for the rebuttal time. To address one of your questions, Judge Jones, concerning the potential import of count three in here, and I believe you've heard some argument that, well, count two was just as bad, count three was maybe less than compared to count two. Well, if you look at this Court's decision in Howard, which was a 2008 decision, that very methodically goes through a similar argument and considers what effect is there when you have one conviction reversed, and the question is can you say beyond a reasonable doubt that the jury didn't base its conviction on the wrong or on the reversed finding, and there's no way you can say that here. Well, now, I'm just looking at your brief where it discusses Howard, and it says, as in Yates, it is impossible to determine whether the jury convicted blah, blah. So is that a Yates case or a Griffin case? Your Honor, I think for our purposes, Yates and Griffin stand for the same proposition, that it has to be a legal finding. If it's a legal finding, you're not going to assume the jury got it right. If it's a factual finding, you're going to assume the jury got it right, and in this case you have a reversed jury finding, so you know the jury got it wrong, and so it's under both of those cases. Oh, so you're not distinguishing Yates and Griffin. Okay, that's interesting. And with respect to the import of count three, I would just like to point out one realtor was called by the government during this trial. It was Liz Merriman, and that's in the record at 702 to 740. She was the realtor for the count three transaction. I'd also like to point out that of four transactions that the jury asked for for the evidence of, count three was one of them, the 3112 11th Street. I'd like to point out the government, in its cross-examination of Harold Lee, started vigorously on one count at the very beginning, or one transaction at the very beginning, the count three transaction, 3112 11th Street. This was a transaction indisputably focused upon by the government, and the jury took note of that. On the sentencing argument, what's your answer to, well, it's wire fraud, so it's good enough? Your Honor, the Bernier case is a wire fraud case. In my brief to the trial court, I said, well, if it's wire fraud, you still have to show interstate wires. Maybe you don't have to show FDIC insurance, but you have to show interstate wires involved with each of these, and they refused my invitation to do it. They said the same thing, oh, trust me, it's in the record, and I don't think that's good enough, and I don't think there should be additional fact-finding when this is remanded on that issue because I don't think they should get a chance to supplement this when I objected to it three times. Your Honors, there's... It would affect his sentencing. Oh, absolutely. It would drop him by either two or four points. Your Honors, there's a right way and a wrong way to do this trial. This trial was done the wrong way. Two of the counts have already proven that. You add to that the issues we've discussed today, the taint spread under the Griffin or the Howard jurisprudence to the other counts, the fact that sua sponte, the district court, edited the indictment and simplified what the jury had defined for count two and totally removed any of the specifics so that they were invited to find on that, and add to that the numerous other things that they were allowed to consider and convict on, and I just ask that the court consider the indictment versus the jury instructions in this case versus the closing and determine whether or not there was a reasonable chance to defend this case. If we agree with you on these legal points, how much of the case could be retried, or how much of it is barred by double jeopardy? Your Honor, I'm not a scholar on double jeopardy. I think it depends on what the basis of the reversal is. If the basis is that count one was vague or it should have been more specific as to the specific fraudulent acts or omissions of which none are mentioned, then I think the count has to be dismissed, and then I think that the statute of limitations would prevent the count from being reasserted. As to some of the issues with the tainting, I really have to submit a supplemental brief on that. I would say that certainly some of these only require a remand and not a complete dismissal of the charges, but I can't give you a better answer than that right now. Okay. We have your argument. Thank you, Your Honor. I appreciate your time. Thank you.